## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DEBRA A. STONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-0630-CVE-PJC |
| | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff filed this action seeking to recover benefits and enforce her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq. (ERISA). Defendant terminated plaintiff's long term disability (LTD) benefits effective February 18, 2015. Plaintiff argues that there is not substantial evidence to support defendant's determination that plaintiff is not disabled. Dkt. # 34, at 34-39. Defendant responds that it conducted a complete investigation and that its decision to terminate plaintiff's benefits was based on substantial evidence. Dkt. # 35, at 30.

### I. Background

Plaintiff is a 58-year-old single woman living with her mother in Tulsa, Oklahoma. At the time of her disability, plaintiff was working for Horizon Health Corporation (Horizon) as a program director, which involved overseeing the operation and management of a 22-bed inpatient mental hospital. Dkt. # 17, at 99, 105. Plaintiff has a masters degree in social work and is a licensed social worker and marriage and family therapist. Id. at 104. After the onset of her disability, plaintiff earned a bachelor of science degree in nursing and a master of science degree in nursing. Dkt. # 24, at 252-53. Plaintiff currently works part-time at Strength of Mind, an outpatient mental health clinic. Dkt. # 22, at 16.

## A.  The Policy

Plaintiff began working for Horizon in 1995. Dkt. # 17, at 99. Through Horizon, plaintiff was insured by a group disability policy issued by defendant that became effective January 1, 2000 and was amended effective January 1, 2002 (policy). Id. at 2-53. The policy provides coverage for both short term disability (STD) and LTD. Id. at 23, 30. Horizon is the plan administrator and fiduciary, with the authority to delegate its duties. Id. at 42. Horizon delegated its duties to defendant, and defendant acted as a fiduciary with the discretion to administer plaintiff's claim. Dkt. # 2, at 2; Dkt. # 10, at 2. The policy defines disability for the purpose of LTD benefits as follows:

> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

Dkt. # 17, at 30 (emphasis omitted). To be eligible for benefits, the policy required the following proof of claim:

> Your proof of claim, provided at your expense, must show:
>
> - that you are under the regular care of a physician;
> - the appropriate documentation of your monthly earnings;
> - the date your disability began;
> - the cause of your disability;
> - the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
> - the name and address of any hospital or institution where you received treatment, including all attending physicians.

We may request that you send proof of continuing disability indicating that you are under the regular care of a physician. The proof, provided at your expense, must be received within 45 days of a request by us.

In some cases, you will be required to give Unum authorization to obtain additional medical information, and to provide non-medical information as part of your proof of claim, or proof of continuing disability. Unum will deny your claim, or stop sending you payments, if the appropriate information is not submitted.

Id. at 13 (emphasis omitted). The policy states the following regarding when LTD payments will cease:

We will stop sending you payments and your claim will end on the earliest of the following:

- during the first 24 months of payments, when you are unable to work in your regular occupation on a part-time basis but you choose not to;
- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to;
- the end of the maximum period of payment
- the date you are no longer disabled under the terms of the plan, unless you are eligible to receive benefits under Unum's Rehabilitation and Return to Work Assistance program;
- the date you fail to cooperate or participate in Unum's Rehabilitation and Return to Work Assistance program;
- the date you fail to submit proof of continuing disability
- after 12 months of payments if you are considered to reside outside the United States or Canada. You will be considered to reside outside these countries when you have been outside the United States or Canada for a total period of 6 months or more during any 12 consecutive months of benefits;
- the date your disability earnings exceed the amount allowable under the plan;
- the date you die.

Id. at 35-36 (emphasis omitted). The policy states that, to the extent the policy is not preempted by ERISA, it is governed by Texas law. Id. at 3. Further, cancellation of the policy will not affect a payable claim. Id. at 44. The policy was terminated on January 1, 2007. Id. at 222.

### B.  Plaintiff's Injury and Disability Claim

In early January 1998, plaintiff was involved in a motor vehicle accident that caused a posterior C6 spinous process fracture. Dkt. # 20, at 93, 107. Later that month, plaintiff had surgery on her injured cervical spine to remove a bone spur and decompress her nerve roots. Id. at 93; Dkt. # 26, at 49. The surgery relieved plaintiff's pain for a few months, but in September 1998 new MRIs revealed degenerative disc disease. Dkt. # 20, at 93. At the time of her spinal injury plaintiff was working for Horizon as a regional clinical director, a position that required frequent travel. Dkt. # 17, at 99. In October 2000, plaintiff transferred jobs within Horizon to program director because her back and neck pain was making travel difficult. Id. In March 2002, plaintiff began seeing Thomas Ashcraft, M.D., an anesthesiologist and pain management specialist, to regulate her pain. Dkt. # 20, at 93. Dr. Ashcraft treated plaintiff with medication and periodic trigger point injections to alleviate her pain. Id. at 83, 85, 87, 89, 91.

On July 26, 2002, plaintiff was pushing a cart of boxes across a parking lot at work when the cart tipped forward, causing plaintiff to fall over the cart. Id. at 46, 81. The fall exacerbated plaintiff's pain. Plaintiff described her symptoms to Dr. Ashcraft a few days after the fall as a burning pain in her back and hands, a constant headache on the left side of her head, and radiating pain in her right arm and hand. Id. at 81. Dr. Ashcraft ordered an MRI of plaintiff's thoracic spine and referred plaintiff to a neurosurgeon Ronald Woosley, M.D. Dr. Woosley found that plaintiff had encroachment on her spinal canal, significant cervical spinal stenosis, hemangioma at T12, and some degenerative changes at T10-11. Id. at 76-78. Due to her pain, plaintiff stopped working at Horizon after August 20, 2002. Id. at 76; Dkt. # 17, at 62, 99. On August 22, 2002, plaintiff was admitted to

the emergency room at St. John Medical Center for intractable back pain. Dkt. # 20, at 34. Plaintiff was treated with morphine and returned to the care of Dr. Ashcraft. Id. at 36.

In December 2002, plaintiff submitted a disability claim to defendant. Dkt. # 17, at 127-30. Plaintiff asserted that she could not remain in an upright position without incapacitating pain. Id. at 129. A vocational consultant for defendant determined that plaintiff's position as a program director most closely approximated director mental health agency, which is classified as a sedentary level occupation. Id. at 105. On March 13, 2002, defendant began paying LTD benefits to plaintiff under a reservation of rights. Id. at 77, 203-05. On June 6, 2003, the Social Security Administration (SSA) informed plaintiff that it had determined she was entitled to monthly disability benefits beginning February 2003. Id. at 62. The SSA determined that plaintiff did not meet medical listing for degenerative disc disease because she did not have a neurogenic distribution of pain, but that her medical records were consistent with a diagnosis of fibromyalgia. Dkt. # 20, at 29. In June 2004, defendant removed its reservation of rights from plaintiff's benefits. Dkt. # 18, at 43, 50-51. In June 2005, defendant transferred plaintiff's claim to its extended benefits center. Id. at 192-93.

## C. Plaintiff's Condition from 2002 to 2013

Plaintiff continued to see Drs. Ashcraft and Woosley while defendant was reviewing her LTD claim. Dr. Ashcraft filled out an estimated functional abilities form in July 2003, estimating that plaintiff could occasionally lift/carry up to 10 pounds; never lift/carry more than 10 pounds; push/pull up to 15 pounds; occasionally bend, climb stairs, and reach above her shoulders; never crawl; and perform two hours of sedentary activity in an eight hour workday. Dkt. # 17, at 153-54. Dr. Ashcraft also continued to treat plaintiff with medication and periodic trigger point injections. Id. at 156-74. In 2003, Dr. Woosley recommended decompression surgery on her cervical spine, but

based on a second opinion from the Texas Back Institute, plaintiff decided against surgery at that time. Id. at 164. Dr. Ashcraft described plaintiff as "100%, permanently, and totally disabled" and noted that she "probably [would] remain so for the rest of her life." Id. at 167. Plaintiff consistently reported pain in her lower back and right arm and numbness in her right hand and leg. See, e.g., id. at 157, 158, 160, 162, 164. Plaintiff tried volunteering at a homeless shelter in 2003 for four hours one day a week for four weeks but stopped because it caused muscle spasms and increased pain. Id. at 187. In 2004, plaintiff told defendant that her pain increased when she tried to do everyday activities. Dkt. # 18, at 64. She reported working approximately 20 hours a month at her school, running errands once a week, and walking her dogs, but that most of her time was spent doing things that could be accomplished while reclining. Id. at 64-66. From April to July 2006, plaintiff worked in a temporary position at a nursing clinic helping triage patients for three hours a day for three to four days a week. Id. at 204, 209.

On February 21, 2007, Christopher Covington, M.D., performed a C3 to C7 fusion, a C3 to C7 anterior discectomy and osteophytectomy, and a C3 to C7 anterior stabilization procedure on plaintiff. Dkt. # 26, at 52. In September 2007, plaintiff had surgery on her right hand for carpal tunnel syndrome. Dkt. # 19, at 74. In November 2007, plaintiff had the same surgery on her left hand. Id. In April 2008, plaintiff began seeing Bhadresh Bhakta, M.D., for her pain management because Dr. Ashcraft had retired. Id. at 73. In June 2008, Dr. Bhakta filled out an attending physician's statement for plaintiff's LTD claim and indicated under restrictions and limitations that plaintiff was "unable to work at present time." Id. at 68-69.

In July 2008, plaintiff sent defendant a updated statement regarding her disability, stating that her 2007 surgeries had resulted in "definite improvement with decreased numbness, weakness

in arms and hands," but that she still had headaches, neck pain, lower back pain, shooting pain down her right leg, pins and needles in her feet, and numbness in her right foot. Id. at 98-99. Plaintiff described her daily activities as waking up between 8 a.m. and 10 a.m., taking two to three hours to get ready, taking a shower two to three times a week, putting on make-up one to three times a week, walking around the yard with her dogs three to five times a week, walking one block three times a week, using a heating pad one to two times a day, and working two to three hours a week as a psychotherapist. Id. Plaintiff asserted that when she tried to increase her work, her symptoms were exacerbated. Id. at 98. In November 2008, plaintiff told defendant that she was working 10 hours per week, and that when she tried to work more she relapsed. Dkt. # 20, at 145. In August 2011, plaintiff reported to defendant that she worked two days per week for a total of 10 to 16 hours, and that when she tried to work 20 hours she ended up bedridden. Id. at 289, 296.

### D.  Plaintiff's August 2013 Surgery and Disability Claim Review

On August 26, 2013, Dr. Covington performed an L3 to L5 posterior lumbar interbody fusion, an L3 to L5 bilateral posterolateral fusion, and an L3 to L5 bilateral laminectomy, medial facetectomy, foraminotomy, and discectomy on plaintiff. Dkt. # 22, at 57. In October 2013, plaintiff told Dr. Bhakta that the surgery relieved her leg pain, but she still had "some localized low back pain," which she rated as a 5/10. Id. at 45. Plaintiff also stated that she was cutting her pain medication in half. Id. On November 5, 2013, plaintiff reported to Dr. Bhakta that her leg pain was "essentially gone," that she had "some residual discomfort in her low back," and pain in her right scapular region and neck. Id. at 47. Plaintiff rated her pain overall as a 3/10. Dr. Bhakta advised plaintiff to stretch and exercise as she healed and to cut back on her pain medication if she was able.

Id. at 48. On November 22, 2013, Dr. Covington wrote the following about plaintiff's improvement

post-surgery:

> Debra Stone returns to my office. She is two and a half most [sic] status post 3 to 5
> fusion. This definitely improved her preoperative condition but she still has a lot of
> back soreness and requires pain medication. She takes MS Contin b.i.d. and an
> occasional Norco. She is fully functional. Her pictures in A/P and lateral projection
> look good. She is making bone.

Id. at 59. On January 16, 2014, Dr. Bhakta took plaintiff off hydrocodone and cut her time release

morphine from 30 mg to 15 mg pills. Dkt. # 26, at 238. On January 31, 2014, plaintiff received a

cervical facet joint injection from Dr. Bhakta. Id. at 236.

On November 8, 2013, defendant requested that plaintiff complete and return a disability

status update form by December 23, 2013. Dkt. # 21, at 190. When plaintiff failed to return the

requested form, one of defendant's benefits center coordinators called plaintiff to check in with her

on January 7, 2014. Id. at 195. Plaintiff admitted that she had been "lax" about getting her

paperwork into defendant. Id. When asked about her current condition, plaintiff reported that after

her August 2013 surgery she no longer had sciatica, but that she still had some neck and lower back

pain and that she still took pain medication. Id. Plaintiff stated that she worked one-and-a-half days

a week. Id. Plaintiff also reported that she volunteered one hour a week calling people for her

church. Id. On January 15, 2014, defendant sent plaintiff a second request for a disability status

update form, asking plaintiff to return the completed form by February 14, 2014. Id. at 200. Also

on January 15, 2014, defendant transferred plaintiff's claim from the extended benefits center to

reassess plaintiff's capacity to work in the wake of her August 2013 surgery. Id. at 205. On February

1, 2014, plaintiff faxed defendant her disability status update form. Id. at 208-12. In the form

plaintiff indicated that she worked 10 to 15 hours per week and her mother helped her with shopping, unloading her car, laundry, and carrying loads over 10 pounds. Id. at 208.

On February 18, 2014, after receiving Dr. Covington's post-surgery records for plaintiff, defendant transferred plaintiff's claim to its disability benefits specialist group for a "more in-depth capacity review and ongoing risk assessment." Id. at 248. On March 20, 2014, plaintiff returned a call from one of defendant's disability benefits specialists and told her that at first plaintiff thought the August 2013 surgery was a "miracle cure," but that she was still having back and neck pain and numbness in her right arm. Dkt. # 22, at 15. Plaintiff stated that she was working part-time for one-and-a-half to two days a week at Strength of Mind seeing patients for therapy and psychiatric medication management. Id. at 16. Plaintiff described her work schedule as Monday 9:30 a.m. to 5 p.m., Tuesday off, Wednesday 9:30 a.m. to 12 p.m. or 12 p.m. to 4 p.m., Thursday off, Friday off. Id. She asserted that sometimes she has more pain the day or two after working. Id.

On March 21, 2014, Dr. Covington faxed defendant an attending physician statement regarding plaintiff's medical status. Id. at 29-30, 54-56. Dr. Covington indicated that he did not think plaintiff could work full-time on a sustained basis in a sedentary position. Id. at 29. In response to a question asking if plaintiff had any current physical restrictions and/or physical limitations, Dr. Covington wrote "N/A – patient is post lumbar fusion [on] 8-26-13." Id. at 55. Dr. Covington also attached his records from plaintiff's visit on March 21, 2014, which stated:

> Debra was last seen in November. We got repeat films today from a C3 to C5 fusion, and it looks like she is solidly fused. She has very little discomfort back there. Most of her discomfort actually is at the base of her cervical spine and radiating out to the top of the shoulder. We did a C3 to C7 anterior cervical discectomy and fusion in 2007, so it is probably a C7-T1 facet. Dr. Bhakta is taking care of that for her.
>
> The patient gave me some forms to fill out regarding her return to work. They asked if she could work full-time. She hasn't worked full-time since the early 2000's, so

9

there is no reason to expect for her to be able to work full-time now. She can work her job, but only on a part-time basis as she was before.

Id. at 30.

Plaintiff received another cervical facet joint injection from Dr. Bhakta on April 4, 2014. Dkt. # 26, at 232. On May 13, 2014, plaintiff had another visit with Dr. Bhakta and reported that the cervical facet procedure helped and she felt "about 50% better" until a few days before the appointment. Dkt. # 25, at 12. Plaintiff reported that her chief complaint was "ongoing problems with numbness in her hand as well as pain radiating down into her right arm." Id. Plaintiff quantified her pain as 6.5/10 and reported that she was "able to walk a little bit longer and was able to go grocery shopping as a result of the [injection]." Id. On June 2, 2014, Dr. Bhakta gave plaintiff an interlaminar epidural steroid injection at T1-2 level. Id. at 16.

Defendant conducted a background investigation of plaintiff, which resulted in defendant discovering that plaintiff had earned two nursing degrees from August 2002 to July 2006. Dkt. # 24, at 252-23. Further, defendant found an "about me" section for plaintiff on Strength of Mind's website, which described plaintiff as follows:

> Deb Stone is an Advanced Practice Registered Nurse, a Clinical Nurse Specialist and a Licensed Clinical Social Worker. Here at Strength of Mind she utilizes her broad educational experience in order to provide individualized assessment, medication management, psychotherapy, and cognitive behavioral therapy. Deb completed her Master of Social Work at OU, followed by a Bachelor and Master of Science in Nursing. Her clinical experience includes two internships at the Veteran's Administration and inpatient and outpatient social work therapy. . . . Deb began working with Dr. McIlroy in 2006, which led to joining the Strength of Mind family in 2011. . . . Outside of the office, Deb actively serves others as a Faith Community Nurse and volunteers at community support services. She also enjoys supporting the local farmers market, communing with nature, enjoying the arts, and creating hand woven projects. She spends time being nurtured by 3 loving dogs, 1 Cockatoo, and a very large garden.

Id. at 170. Defendant also ordered two days of surveillance of plaintiff, which was conducted on June 10 and 11, 2014. Dkt. # 24, at 208-24. On June 10, plaintiff did not leave her house. Id. at 212-13; Dkt. # 30. On June 11, plaintiff dropped off two large dogs at Woodland South Animal Hospital around 9:15 a.m. Dkt. # 24, at 219; Dkt. # 30. Plaintiff then drove to Strength of Mind, arriving around 9:30 a.m. Dkt. # 24, at 219; Dkt. # 30. Plaintiff left Strength of Mind around 6:00 p.m. and drove to Woodland South Animal Hospital. Dkt. # 24, at 222; Dkt. # 30. After picking up her two dogs, plaintiff drove home. Dkt. # 24, at 223; Dkt. # 30.

On August 5, 2014, plaintiff told Dr. Bhakta that the latest epidural steroid injection was still helping her and she had "a lot more range of motion." Dkt. # 25, at 14. She complained of some pain at the base of her skull and shoulders, but rated her pain as a 4/10 and stated she was "quite content with her current pain control." Id. Plaintiff made similar statements to Dr. Bhakta at her September 16, 2014 visit, telling him that she was "doing fairly well from the epidural injection," that she occasionally has "a little bit of pain [in her back] when the weather changes," that she was "content with her morphine," and rated her neck pain as a 6/10. Dkt. # 26, at 226.

Defendant ordered an additional two days of surveillance, which were conducted on September 9 and 10, 2014. Dkt. # 25, at 48-66. On September 9 around 7:30 a.m., plaintiff was observed walking three large dogs. Id. at 54; Dkt. # 30. The surveillance video shows plaintiff bending down without any observable difficulty or hesitation. Dkt. # 30. Plaintiff returned to her house with the dogs about a half-hour later. Dkt. # 25, at 55. Plaintiff then drove to Southern Hills United Methodist Church, arriving around 8:15 a.m. Id. at 56; Dkt. # 30. Around 9:00 a.m. plaintiff was observed exiting the northwest door of the church, holding the door for another person to exit. Dkt. # 25, at 56; Dkt. # 30. A sign was posted pointing at the northwest door advertising

11

"Preventative Health Screenings." Dkt. # 25, at 56; Dkt. # 30. Plaintiff returned to the church through the same door, and was not observed again until about 10:30 a.m., when she exited the church carrying several plastic bags on her right arm. Dkt. # 25, at 56-57; Dkt. # 30. Plaintiff put the bags in the trunk of her car and then opened the front doors of her car and bent over into her car, appearing to search for something in the car. Dkt. # 25, at 57; Dkt. # 30. Plaintiff returned to the church and did not leave again until about 2:15 p.m., when plaintiff drove home. Dkt. # 25, at 57-59; Dkt. # 30.

On September 10 around 7:30 a.m., plaintiff left her house on a walk with one large dog. Dkt. # 25, at 61; Dkt. # 30. The surveillance video shows plaintiff bending over a fence with apparent ease to retrieve something from the ground and bending over at least three more times to pick something up from the ground. Dkt. # 25, at 61; Dkt. # 30. Plaintiff appears to intermittently walk at a brisk pace with her dog having to trot at times to keep up. Dkt. # 30. Plaintiff returned with the dog to her home around 8:30 a.m. Id.; Dkt. # 25, at 61. About 8:45 a.m., plaintiff left her house on a walk with another two large dogs. Dkt. # 25, at 61-62; Dkt. # 30. Plaintiff appears to walk at a slower pace than earlier in the morning. Dkt. # 30. Plaintiff bent over to pick something up from the ground at least three times. Dkt. # 25, at 61-62; Dkt. # 30. Plaintiff returned to her home with the dogs around 9:00 a.m. Dkt. # 25, at 62; Dkt. # 30. Plaintiff then drove to the Woodland South Veterinary Hospital, where she dropped off the two large dogs from her second morning dog walk. Dkt. # 25, at 63; Dkt. # 30. Plaintiff then drove to Strength of Mind, arriving around 9:30 a.m. Dkt. # 25, at 63; Dkt. # 30. Plaintiff left Strength of Mind around 6:15 p.m. and drove to Woodland South Animal Hospital. Dkt. # 25, at 64; Dkt. # 30. After picking up the two dogs, plaintiff drove home. Dkt. # 25, at 64-65; Dkt. # 30.

On November 4, 2014, plaintiff visited Dr. Bhakta, during which she told him that she was disappointed in the August 2013 surgery because some of the pain in her right buttock area, which she rated as an 8/10, was returning. Dkt. # 26, at 224. Plaintiff also complained of neck pain, noting that the facet injection from April 2014 was wearing off. Id. On November 21, 2014, plaintiff received a sacroiliac joint injection from Dr. Bhakta. Id. at 222. Plaintiff reported her pain changed from a 7/10 to a 5/10 after the procedure. Id. at 223. The procedure was repeated on January 30, 2015. Id. at 220.

One of defendant's personal visit consultants conducted an hour-and-a-half field visit with plaintiff at her home on November 20, 2014. Dkt. # 25, at 100-05. The consultant observed that plaintiff "[w]hile seated, periodically shifted her weight from side to side and stood twice to stretch her back and pace back and forth." Id. at 101. Plaintiff also "constantly rubbed her hands and flexed her fingers making fists" and displayed both visual and audible signs of physical pain and discomfort." Id. When asked about her nursing degrees, plaintiff asserted that she took most of her classes online, but that she had to go to campus for exams and clinical work. Id. at 102. Plaintiff reported working for Strength of Mind for 15 to 17 hours a week over one-and-a-half days, and that she had no intention of increasing her hours because the work she already did was hard enough on her. Id. Plaintiff described her current symptoms as "cervical pain, low back pain with periodic numbness and loss of sensation in her hands." Id. at 103. When asked about her ratio of good days to bad, plaintiff said that "basically all of her days are bad." Id. And when asked about her current restrictions and limitations, plaintiff "said that no formal restrictions or limitations have been placed on her" and that "she basically does what she can do and does not physically overexert herself." Id. Plaintiff described her typical day as waking up between 6:00 and 7:00 a.m., taking a hot shower

or bath, meditating, eating breakfast, doing stretching exercises, and then walking her dogs. Id. at 104. Plaintiff asserted that her days involve everything "in moderation with frequent rest breaks." Id.

One of defendant's disability benefits specialists called the offices of Drs. Covington and Bhakta on February 12, 2015 to inquire whether either doctor was asserting restrictions or limitations for plaintiff. Id. at 118-19. An employee of Dr. Covington advised her that as plaintiff had not been seen since March 2014, Dr. Covington would not have a current opinion on plaintiff's condition. Id. at 118. An employee of Dr. Bhakta confirmed that he was not providing any restrictions or limitations for plaintiff. Id. at 119.

### E.  Claim Termination and Plaintiff's Appeal

On February 13, 2015, Dianna Neal, M.D., a medical consultant for defendant, reviewed plaintiff's file. Id. at 127-28. Dr. Neal found that, based on her review of defendant's medical records, plaintiff's pain was adequately controlled with her medication regimen, that she could walk with minimal assistance, that she had grossly normal strength in all extremities, and that her C3-5 was solidly fused. Id. at 127. Dr. Neal noted that the surveillance videos showed plaintiff "walking dogs, driving, lifting/carrying items, and bending/reaching" with "no obvious pain behaviors or difficulty with any of the activities." Id. Thus, Dr. Neal determined that plaintiff was no longer precluded from full-time sedentary work. Id.

On February 16, 2015, one of defendant's disability benefits specialists called plaintiff and told her that defendant was terminating her benefits because she had demonstrated abilities above the physical requirements for sedentary work and no physician was asserting restrictions or limitations or that she was unable to work. Id. at 149. This phone call was followed up on February

14

19, 2015 with a letter, which in addition to the reasons provided on the phone call, cited plaintiff's 2007 and 2013 surgeries, her ability to obtain her two nursing degrees after the onset of her disability, and Dr. Neal's review of plaintiff's file as information supporting termination of plaintiff's LTD benefits.[1] Dkt. # 26, at 23-24.

Plaintiff appealed defendant's decision on August 18, 2015. Id. at 202-51. Plaintiff argued that she was unable to work full-time in a sedentary position. Id. at 206. Plaintiff asserted that Drs. Bhakta and Covington told defendant that she could not work full-time, that the surveillance videos did not prove that she could work full-time, and that the consultant's observations from the field visit support finding her disabled. Id. at 205-06. Plaintiff also attached to her appeal additional records from Dr. Bhakta, a functional capacity evaluation (FCE) conducted on July 24, 2015, and a declaration from plaintiff containing her activity log for the 24 hours following the FCE. Id. at 209-51. The FCE was conducted by a physical therapist, who concluded that plaintiff could not work full-time in a sedentary position because she had limited motion in multiple joints, generalized weakness of all major muscle groups, limited mobility with an abnormal gait, and difficulty with coordination and sensory loss. Id. at 247. Additionally, plaintiff reported that after the four-hour FCE she had increased pain and needed additional sleep and reclining to recover. Id. at 250-51.

Defendant had three medical professionals review plaintiff's complete medical history and appeal: David Frank, P.T., M.S.; Wade Penny, M.D.; and Jonathan McAllister, II, M.D.  Frank

---

[1]   The February 19, 2015 letter contains a factual inaccuracy in its explanation of the termination decision. The letter asserts that plaintiff had not seen Dr. Bhakta since August 5, 2014. Dkt. # 26, at 24. As of the date of the letter, plaintiff had visits on September 16 and November 4 and injections on November 21 and January 30 with Dr. Bhakta. See Dkt. # 26, at 220-26. While it appears the initial termination decision may have been based in part on incomplete information, defendant had access to and considered Dr. Bhakta's complete records in its decision on appeal. See Dkt. # 27, at 156-64.

found that plaintiff's pain was being addressed through injections and medication, that imaging showed a solid L3-L5 fusion, and that the FCE results were contradicted by Dr. Bhakta's records and the surveillance videos. Dkt. # 27, at 128-29. Dr. Penny, an orthopedic surgeon, found that restrictions and limitations on plaintiff were not supported. Id. at 139. He asserted that plaintiff's complaint of chronic pain was "not consistent with the medical documentation and the insured's reported activities," and that there was evidence of increased functional capacity after plaintiff's 2013 surgery "based upon an increase in upper extremity strength and a reduction in opiate consumption." Id. at 140. Further, while Dr. Penny found that plaintiff had conditions in her cervical and lumbar spine that were consistent with impairment, he opined that the FCE was of "questionable validity" because (1) the strength deficits were inconsistent with Dr. Bhakta's examinations, (2) plaintiff's demonstrated abilities on the surveillance video belied the FCE's findings regarding gait, walking velocity, and pulling strength, (3) the dynamometer testing failed to produce a valid assessment of maximum functional grip strength, and (4) the reported distribution of hand numbness did not follow a neurological pattern. Id. Dr. McAllister, an internal medicine specialist, also found that restrictions and limitations on plaintiff were not supported. Id. at 151. Dr. McAllister asserted that the FCE could not be taken as plaintiff's maximum capacity because it did not include the "appropriate validity testing (heart rate/blood pressure before and after testing) suggestive of maximum effort" and the grip testing did not "reflect the appropriate bell shaped curve." Id. at 152.

On October 2, 2015, defendant denied plaintiff's appeal. Id. at 156-64. The decision letter sent to plaintiff asserted that plaintiff's evidence of spinal disorder, pain, carpal tunnel, depression and anxiety, and fibromyalgia were not consistent with impairment to the degree she could not perform full-time sedentary work. Id. at 157-60. Additionally, the letter explained that the FCE was

of questionable validity for the reasons found by Drs. Penny and McAllister. Id. at 160. Plaintiff appealed defendant's decision to this Court on November 3, 2015. Dkt. # 2. Plaintiff argues that defendant's decision is not supported by substantial evidence because the reasons given for terminating plaintiff's benefits are "wrong and immaterial" and the overwhelming totality of the record supports a finding of disability. Dkt. # 34, at 34. Defendant asserts that it conducted a "complete and wholly reasonable investigation" of plaintiff's claim, and that it made the correct decision based on the information contained in the record. Dkt. # 35, at 29.

## II.  Standard of Review

As a preliminary matter the Court must establish the proper standard of review for plaintiff's ERISA claim. Plan beneficiaries, like plaintiff, have the right to federal court review of benefit denials and terminations under ERISA.  "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover benefits due to [her] under the terms of the plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." The default standard of review is de novo. However, when a plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a challenge under § 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard. See Firestone, 489 U.S. at 115 (applying a deferential standard of review when the plan administrator or fiduciary has discretionary authority to determine eligibility for benefits or to construe the terms of a plan).

### A.  Texas's Discretionary Clause Ban

In December 2010, Texas adopted a law banning discretionary clauses in insurance forms. See Tex. Admin. Code § 3.1203. Discretionary clause is defined as a provision that gives rise to a deferential standard of review to the original claim decision in an appeal process or purports to bind a claimant to an adverse claim decision or policy interpretation. Id. at § 3.1202. The discretionary clause ban applies to "forms offered, issued, renewed, or delivered on or after June 1, 2011." Id. at § 3.1201(b). The ban also applies to forms issued or delivered prior to June 1, 2011 that do not contain a renewal date on the occurrence "of any rate increase applicable to the form or any change, modification, or amendment of the form occurring on or after June 1, 2011." Id. at § 3.1201(d).

The parties agree that defendant acted as an ERISA fiduciary with discretionary authority to administer the policy. Dkt. # 34, at 6; Dkt. # 10, at 2. However, plaintiff argues that her suit should be reviewed under a de novo standard because Texas's discretionary clause ban applies to the policy. Dkt. # 34, at 29-30. Plaintiff asserts that the form of the policy is C.FP-1, and that defendant filed a replacement for form C.FP-1, named C.FP-6, with the Texas Department of Insurance (TDI) in March 2010. Id. at 6-7. Plaintiff also asserts that defendant filed an amendment to form C.FP-6 with the TDI in May 2014. Id. at 8. Plaintiff argues that the 2014 amendment triggers the discretionary clause ban, and thus defendant's decision under the policy should be reviewed de novo. Id. at 30-31.

Plaintiff's argument fails because the discretionary clause ban does not apply the policy in this case. Plaintiff asserts that C.FP-6 is a revision of C-FP-1, but the documents provided by

18

plaintiff regarding the insurance forms[2] indicate that C-FP.6 is a different and new form that "t[ook] the place of [defendant's] currently marketed C.FP-1" form. Dkt. # 34-1, at 195. Because defendant's C.FP-1 and C.FP-6 are different forms, defendant's 2014 amendment of C.FP-6 does not cause the policy to fall under the discretionary clause ban. Additionally, the policy has not been amended since 2002 and was terminated 2007. In Rogers v. Reliance Standard Life Ins. Co., No. 14-cv-4029, 2015 WL 2148406 at *7 (N.D. Ill. May 6, 2015), an Illinois district court applying Texas law found that the discretionary clause ban did not apply because there was no evidence "showing the parties agreed to material or significant changes" to the policy after June 1, 2011 and the law is not retroactive. Id.; see also Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 867 (9th Cir. 2008) ("Assuming that the Commissioner may prohibit insurance companies from using this discretionary clause in future insurance contracts, he cannot rewrite existing contracts so as to change the rights and duties thereunder."). Here, the policy was last amended in 2002 and terminated in 2007. The discretionary clause ban does not apply to a contract terminated four years before the law went into effect.

---

[2]     Plaintiff attached three exhibits to her opening brief (Dkt. # 34). The exhibits included publicly available information regarding defendant's filing of insurance forms with the TDI. See Dkt. # 34, at 8 n.3. Defendant did not object to plaintiff's exhibits in its response brief, and cited the exhibits itself in its response brief. Dkt. # 39, at 2 n.2. Federal courts are usually limited to the administrative record when reviewing an adverse decision or interpretation under ERISA. See Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1157 (10th Cir. 2010). However, a district court may consider material beyond the administrative record in limited circumstances. See id. at 1162 (allowing consideration of materials outside the administrative record for the limited purpose of evaluating an administrator's dual role conflict of interest). Here, the Court considers plaintiff's extra-record materials for the limited purpose of determining the applicability of Texas's discretionary clause ban.

### B.  Arbitrary and Capricious Standard

Because the policy gives a fiduciary discretionary authority to administer the policy and the discretionary clause ban does not apply, defendant's decision to terminate plaintiff's benefits should be reviewed under an arbitrary and capricious standard. Under the "pure" version of the arbitrary and capricious standard, a plan administrator's or fiduciary's decision will be upheld "so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006).  That basis "need not be the only logical one nor even the best one." Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1269 (10th Cir.2002) (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999)). The decision merely must "reside[] 'somewhere on a continuum of reasonableness-even if on the low end." Adamson, 455 F.3d at 1212 (quoting Kimber, 196 F.3d at 1098). A plan's decision will not be set aside "if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

By contrast, "[i]ndicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by a fiduciary." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002). The Tenth Circuit has held that "'[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.'" Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citation omitted). The reviewing court should give less deference to a decision if the plan administrator or fiduciary fails to gather or to examine relevant evidence. Caldwell, 287 F.3d at 1282.

## C.  Fiduciary Conflict of Interest

If an ERISA fiduciary plays more than one role – i.e., deciding eligibility and paying benefits claims out of its own pocket – a conflict of interest arises. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008); Graham v. Hartford Life & Acc. Ins. Co., 589 F.3d 1345, 1358 (10th Cir. 2009). In Glenn, the Supreme Court rejected any argument that this conflict of interest requires courts to shift the burden of proof to the plan administrator in cases where a conflict of interest exists. Glenn, 554 U.S. at 117. Instead, "Glenn embraces . . . a 'combination-of-factors method of review' that allows judges to 'tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together.'" Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1193 (10th Cir. 2009) (quoting Glenn, 554 U.S. at 118). "A conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . .'" Id. (quoting Glenn, 554 U.S. at 117).

Defendant has an inherent conflict of interest in this case because it plays more than one role by deciding benefits eligibility and paying benefits claims. Plaintiff argues that defendant's "aggressive investigation" suggests that its dual-role conflict affected its decision regarding plaintiff's claim. Dkt. # 38, at 23-26. Specifically, plaintiff asserts that defendant's transfer of plaintiff's claim from the extended benefits center for additional review in January 2014 was baseless, that defendant used plaintiff's failure to turn in her updated forms on time as an excuse to open an investigation on plaintiff's claim, and that defendant's investigation was improperly conducted. Id. Plaintiff's argument seems to be that defendant's investigation was too thorough.

However, nothing in the policy bound defendant to its initial disability determination. In fact, the policy required plaintiff to provide proof of continuing disability. The administrative record indicates that defendant transferred plaintiff's claim because defendant wanted to reassess plaintiff's capacity to work after learning about her August 2013 surgery. Whether plaintiff was timely in turning in her updated forms, opening an investigation to determine plaintiff's abilities after a major surgery is entirely reasonable.

Moreover, even if a fiduciary could be too thorough in its investigation, nothing in the record suggests defendant did anything too "aggressive." Over its year-long investigation, defendant requested records and opinions from plaintiff's treating physicians, asked for updates from plaintiff on her condition and activities, conducted a background search on plaintiff, conducted four days of surveillance, sent a representative to complete a short home visit with plaintiff, and had multiple medical professionals review the information collected. The Court finds that defendant's investigation does not show any bias beyond defendant's inherent dual-role conflict of interest. Therefore, consistent with Glenn and Tenth Circuit precedent, the Court will "dial back" its deference to defendant's decision and give some weight to defendant's inherent conflict of interest, see Weber v. GE Grp. Life Assur. Co., 541 F.3d 1002, 1010 (10th Cir. 2008), but will not substantially reduce the level of deference to the defendant's decision, see Holcomb, 578 F.3d at 1193.

### III. Discussion

Plaintiff argues that defendant's decision is not supported by substantial evidence because any evidence that plaintiff is not disabled is overwhelmed by evidence that she is totally disabled under the policy. Dkt. # 34, at 34. Moreover, plaintiff claims that the surveillance videos fail to

prove she is not disabled, that Dr. Penny's conclusion that plaintiff's pain was not consistent with her medical records is subjective, that defendant's exclusive reliance on in-house medical consultants was an abuse of discretion, and that plaintiff's decreasing opiate use is not an indication that her condition had improved. Id. at 34-38.

An overwhelming amount of evidence indicates that plaintiff's condition improved after the August 2013 surgery. When plaintiff initially filed her claim with defendant, she asserted that she could not remain in an upright position without incapacitating pain. In 2003, plaintiff could not sustain working four hours a day without muscle spasms and increased pain. In 2008, plaintiff reported taking two to three hours to get ready in the morning and the ability to walk her dogs no farther than around the yard. After her August 2013 surgery, plaintiff reported that her leg pain was gone and her back pain was less severe. Plaintiff worked two days a week, at least one of which was a full eight-hour day. Moreover, the surveillance videos show plaintiff walking her dogs one morning before a full day of work for approximately an-hour-and-a-half. Plaintiff's medical records and self-reported pain indicate she still had pain after the August 2013 surgery, but the record clearly indicates that after two spinal surgeries and two carpal tunnel surgeries, plaintiff's condition had significantly improved.

Further, there is substantial evidence that plaintiff's condition improved to the point she was no longer disabled. Under the policy, disability is defined as the inability due to sickness or injury to "perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training or experience." Dkt. # 17, at 30. Defendant determined that plaintiff could sustain full-time sedentary work. Sedentary work is defined as exertint up to 10 pounds of force occasionally, sitting most of the time, and walking or standing for brief periods of time. Dkt. # 27, at 157. In support of

its decision, defendant asserted that: (1) Drs. Covington and Bhakta refused to assert restrictions and/or limitations on plaintiff, (2) that plaintiff's August 2013 surgery was reasonably expected to restore plaintiff's capacity for sustained sedentary function, (3) that Dr. Bhakta's periodic injections were consistent with "a low intensity level of symptom management," (4) that plaintiff was able to greatly reduce her use of pain medication, (5) that Dr. Bhakta's records show plaintiff could ambulate with little assistance and had grossly normal strength in all extremities, and (6) that Dr. Bhakta did not order repeat MRI, CT myelogram, or other diagnostic tests as would be expected with a patient in severe pain. Dkt. # 27, at 157-59. Moreover, defendant determined that the FCE was "of questionable validity in assessing impairment" because: (1) the strength deficits noted were inconsistent with Dr. Bhakta's exams; (2) the surveillance videos show plaintiff engaging in activities that contradict the FCE's noted limitations of hip and spine range of motion, gait abnormalities, treadmill walking velocity, and pulling strength; (3) dynamometer testing failed to produce a valid assessment due to procedural faults; (4) there is no explanatory diagnosis consistent with the pattern of hand numbness reported; (5) the grip testing did not reflect the appropriate bell shaped curve; and (6) the FCE did not include the appropriate heart rate or blood pressure testing to ensure maximum effort. Id. at 160. Defendant also opined that plaintiff's reported fatigue after the FCE was not consistent with her reported and observed ability to remain at work for over eight hours. Id.

Moreover, the evidence supporting a finding of disability does not overwhelm the evidence supporting defendant's decision. The record contains evidence that plaintiff was disabled. Most significantly: (1) Dr. Covington asserted that he did not think plaintiff could work full-time on a sustained basis in a sedentary position; (2) Dr. Bhaka's records indicate plaintiff consistently

complained of pain, sometimes rating her pain as high as an 8/10; (3) plaintiff reported that she was in constant pain, was already working as much as she can, and could not work full-time; (4) the home personal visit consultant observed that plaintiff could not remain seated without shifting her weight around and occasionally pacing; and (5) the FCE concluded that plaintiff could not work in a full-time sedentary position. However, the evidence of disability hardly overwhelms the substantial evidence discussed above supporting defendant's decision.

Plaintiff also argues that much of the evidence defendant cites is flawed or irrelevant. First, plaintiff asserts that "the surveillance videos are nothing more than scraps," and that nothing in the videos shows plaintiff engaging in any activities inconsistent with a disabled person trying to be as active as possible. Id. at 35. While it is true that the surveillance videos do not capture a large amount of time, what is captured contradicts the FCE and some of plaintiff's self-reported limitations. The videos show plaintiff leaving her home with one of her dogs on a walk, returning an hour later, then leaving with the other two dogs, returning a half an hour later, and then going to work for almost nine hours. Plaintiff's gait, pace of walking, bending, grabbing, and pulling displayed on the videos contradict the FCE findings that plaintiff could not pull more than four pounds or push more than 11 pounds with both hands, that plaintiff could not walk longer than four minutes at 0.5 miles per hour, that plaintiff could not complete tests involving bending below knee height, that plaintiff had only a limited ability to bend and reach objects from the floor, and that plaintiff had an abnormal gait. Dkt. # 26, at 245-47. Also contradicted by the videos are plaintiff's assertions during the FCE that she worked half-a-day or less and could walk with her dogs for only about a block. Id. at 241-42. The administrative record indicates that the medical consultants all considered the surveillance videos in conjunction with the rest of plaintiff's file. Thus, while the

surveillance videos are not conclusive in and of themselves, they are an important piece of information supporting defendant's decision that the reviewing physicians could consider in conjunction with plaintiff's medical records and self-reported activities. See Rizzi v. Hartford Life and Acc. Inc., 383 F. App'x 738, 752 (10th Cir. 1010)[3] ("Reliance on surveillance evidence in conjunction with medical evidence is not improper.") (emphasis omitted).

Second, plaintiff argues that Dr. Penny's conclusion that plaintiff's complaints of chronic pain were not consistent with the medical documentation and plaintiff's reported activities is subjective. Dkt. # 34, at 36. Plaintiff asserts that plaintiff's injections and medications support her assertions of pain. Id. at 37. However, defendant's position is not that plaintiff is pain free, but that her pain is managed through injections and medication to the point that she can work in a full-time sedentary position. Dkt. # 39, at 27. Dr. Bhakta's records show that plaintiff's pain was less severe following the August 2013 surgery. Plaintiff reported that the injections helped her walk longer and increased her range of motion. In August 2014, plaintiff told Dr. Bhakta that she was "quite content with her current pain control." Dkt. # 25, at 14. Dr. Covington's records also indicate that plaintiff's pain was reduced by the August 2013 and that plaintiff's post-surgery pain was being managed by Dr. Bhakta. Dkt. # 22, at 30. However, Dr. Bhakta's records also indicate that plaintiff was disappointed with the amount of pain she still had after the August 2013 surgery and that she still sometimes complained of severe pain. See, e.g., Dkt. # 26, at 224. Dr. Penny's conclusion was not unreasonable based on the entire record and his experience as a board certified orthopedic surgeon. Plaintiff reported herself that the surgery decreased her pain and that the injections helped her pain

---

[3]      This and all other unpublished opinions are not precedential, but they may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

and physical abilities for months after each procedure. Further, the surveillance video showed plaintiff volunteering at a medical screening for over five hours and then the next day walking her dogs for an hour and a half before going to work for over eight hours. Despite other evidence to the contrary, Dr. Penny's conclusion has adequate support in the record.

Third, plaintiff contends that defendant's reliance on in-house medical consultants and its failure to conduct further medical testing amounts to an abuse of discretion. Dkt. # 34, at 37. Plaintiff does not argue that defendant was required to order additional testing, but that its failure to do so "raises questions." Id. at 38. Plaintiff's claim was reviewed by four medical consultants, Frank, a physical therapist, and Drs. Neal, Penny, and McAllister. The medical consultants' reports are thorough and based on years of medical records from plaintiff's treating physicians. Plaintiff has provided no reason to suspect the consultants' reviews were biased or inaccurate apart from the fact that they were hired by defendant and conducted file reviews, neither of which amounts to an improper investigation. See Rizzi, 383 F. App'x at 750 ("General accusations of bias against [reviewing physicians] do not provide a reason to doubt what otherwise appear to be competent and reasonable opinions."); Judge v. Metro. Life Ins. Co., 710 F.3d 651, 663 (6th Cir. 2013) ("[R]eliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly.") (alteration in original) (quoting Calvert v. Firstar Fin. Inc., 409 F.3d 286, 295 (6th Cir. 2005)).

Fourth, plaintiff asserts that defendant cannot use her failure to increase her pain medication as evidence of plaintiff's improved condition. Dkt. # 34, at 38. Plaintiff cites Bencivenga v. Unum Life Insurance Co. of America, No. 14-10118, 2015 WL 1439697 (E.D. Mich. Mar. 27, 2015), for the contention that decreased opiate use is not evidence of decreasing pain. Dkt. # 34, at 38.

However, the court in <u>Bencivenga</u> did not believe changes to the plaintiff's medication regimen were evidence of improvement in his medical condition primarily because the plaintiff was a heroin addict and his doctor's motivation for changing the plaintiff's medication was likely impacted by his concern for his patient's addiction. <u>See</u> <u>Bencivenga</u>, 2015 WL 1439697, at *11. Here, there is no evidence that plaintiff was addicted to her medication. Dr. Bhakta told plaintiff that reducing her medication would be preferable, but Dr. Bhakta's records indicate that he changed plaintiff's prescription in response to plaintiff reducing her medication intake on her own. <u>See</u> Dkt. # 26, at 239-40. Based on the circumstances surrounding plaintiff's medication reduction, it was not unreasonable for defendant to rely on that reduction as one of many factors supporting its decision.

The Court finds that defendant's decision to terminate plaintiff's LTD benefits falls well within the "continuum of reasonableness" and this decision is supported by substantial evidence. Although the administrative record contains evidence supporting plaintiff's position, it does not come close to overwhelming the substantial evidence supporting defendant's decision. Defendant's decision was reasonable and based on far more than a scintilla of evidence. As the Court has noted, defendant had discretionary authority to administer the policy and, dialing back the level of deference to account for defendant's inherent conflict of interest, the Court finds that defendant did not abuse its discretion by terminating plaintiff's LTD benefits.

**IT IS THEREFORE ORDERED** that plaintiff's claim for reinstatement of LTD benefits is **denied**. A separate judgment is entered herewith.

**DATED** this 5th day of January, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE